Appeal 15-1848 is concerned. That case is submitted. And we'll turn to the next one, which is 15-18, I'm sorry, 16-49, Software Rights Archive v. Facebook and others. Mr. Harady, and I think to the extent that the issues are the same and overlap, you might just tell us that and proceed to whatever new issues you wish to raise. Sure. Okay. So I want to continue on. In fact, for Claim 18 and the 494 patent, it also has a structure that requires you to create a first numerical representation and direct relation. Okay. So you're saying that the same issue exists in this next case? That's correct. I don't think we need to repeat ourselves. Okay. So then the – so along with that same issue, I want to point something out and address something that she said. She seemed to say that a few points being negative, that doesn't mean anything. That means they're all still useful. Just because they're negative, it's not useful. And I think that I really want to address that, and she's citing the Moutet argument, citing the case Moutet. I'd like to direct the court to page 31 of the SRA's reply brief. And what we have depicted on page 31 is table 8.11. Okay. This is the reply brief in this case? That's correct. Oh, wait a minute. Let me – I apologize, Your Honor. That's the 352 citation, but the same point is in both briefs. It's found on page 29 of the 494 brief. Page 29 of your gray brief in the 1648? It's page 29 of the 494 numeric representation brief. What is the number of that? 1649. Okay. If we turn to that table, I just want to show exactly what we're talking about when we say these things harm versus direct links. The table on page 29? Page 29 of the reply brief, appellate response brief. And I feel 1649? Is there a table on page 29? It's the yellow brief, right? It looks like this. There's a big table there. Okay. Yes. It's the yellow brief. Okay. Okay. Proceed. Okay. If we look at this table, I want to direct you to where the first arrow is and show you how to read these tables because they have a very clear picture here. What you see is terms and LN, right? And that produced an 8.8 improvement versus term or precision of .3431. And that's using just terms and direct links to search. Now we look to the second result, and what you'll see is terms, BC, and LN are being tested. And the only difference between the other result is that BC and indirect relationship is added to the search vector and then the test is run. And what it shows is the impact of adding BC by itself is negative 7.7%. It's not that it's less effective. It's actually harmful to the search. It's contributing negatively to the search. Because terms and direct links are in both subvectors, and the only difference is BC, you are actually isolating BC's impact, and it's harmful. Not a viable alternative, not a less effective alternative. Now in this particular case, we see it's negative 7.7%. I want to point out that if you look at Salton's work, and Salton is the thesis advisor of Fox, what his work demonstrated is... ...an X next to the BC and an X next to the LN, and it says plus 10.0. Okay. That one is using direct links and LN using regression coefficients. Now how it differs than the previous test is the regression coefficients, they look at the correct answers, and then they try to rejigger weights to optimize the outcome. And in this case, they... And so in that case, by using LN, they got a 10% improvement, which is even a stronger case of just using direct links by themselves. I don't understand that. I don't see how that's... I mean, we've got a plus 10. That's better than plus 8.8. Right. And that's from terms and direct links. I understand the one you're pointing at. I'm pointing to the one from the fifth from the bottom. Fifth from the bottom. One, two, three, four, five. See how there's a BC and there's an LN with an X next to each... BC, LN. Okay, so they added BC there. If you compare BC... That's the exact point. What you see here in this particular instance with the regression coefficients turned on, when you compare direct links and BC and LN to using just terms and LN, which is the result... You see the plus 10? That's the third result in this section, or one, two, three, four above? Again, you show that the impact of BC in this particular test was actually zero, meaning that... Well, actually, it's a slightly negative 0.01%. Negative 0.01 when you make a comparison. This is for the CACM database, right? That's correct. Isn't this this database where Fox himself opined that maybe BC isn't as good for this particular database just because of the particular data that's in this database? No, he actually says something much stronger than that. What he says to this, based upon the experiments on this database... There were limitations to the database in his view, which is why he didn't feel like the BC was as effective as it could have been otherwise. First off, you need to understand that... Am I wrong in my understanding of what he said? Yes, I believe it's incorrect. What he's actually saying is this. He's saying, based upon these tests... And this is the quote. And it's actually... If you flip the page, you will see a series of these quotes on page 30. Just flip to the next page. It will direct you to where to find these. The first thing I want to point from this is what he says is that if the other subvectors are present, CC is not really needed, and BC is probably not either. That directly... One of the subvectors we're talking about was the LN subvector. He's directly stating, if you have the LN subvector, you don't need BC and you don't need CC. And then he goes on. The very next thing he says about this is that his ultimate recipe of what subvectors you should use are direct links, terms, and no BC and no CC. If I could get you to look at page 12 of the opening brief, we can see these quotes in full. This isn't a mixed bag. Because the CAC... I was looking at JA 5594. I'm sorry. This is going back to the 352 patents, JA. There's a sentence in there. I'm sure you're familiar with it. Since the CACM collection of bibliographic data based only on internal references, that is between pairs of articles in the same journal, it is not surprising that the BC subvector seems rather sparse and not very useful. So it's a commentary more on the nature of the data being mined rather than on the nature of the algorithm being used. Well, I would suggest to you that's directly suggesting what I'm saying. What he's saying is, and I don't have the quote in front of me, but I think what I just heard you say is that the CACM is a closed collection where the analyzed links are direct relationships between the objects in the database. That's different than the ISI test that these positive quotes come from where it's only using source-sided pairs outside the database. That's a direct reference. When direct citations in the database are there, BC is not very needed or not very important. And that's exactly what we're saying here. And indeed, this is far more explicitly said, if I could get the court to turn to on page 12 of the opening brief, which is, if I can pull that out. If we could turn to page 15 of the opening brief on the 494, here are the quotes directly on point. And this is what I'm talking about. When it comes to the specific issue of whether indirect relationships outperform direct relationships, there's only one story being told in these papers. On page 15, what we can see here are two quotes that I think the court should particularly focus on. If we're there, I will read them too. It can be inferred, however, that if the other subvector is present, CC is not really needed and BC is probably not either. In other words, if you create a direct link subvector, just like the Claim 26 requires you to do, then you don't need BC and CC. And why? Because they harm the search results. Then look at the next quote we see. The recipe proposed is to at least employ terms, some manually assigned category scheme, that's a CR, and direct links between the documents, LM. In other words, use only the direct relationships to search. That's what these empirical results that I'm saying are teaching. And he's explicitly stating it right here that that is what you should do. He says at least. You're saying that excludes any alternative. I'm sorry, I didn't understand your question. What you just read to us is at least employ terms. Right. You're saying that that's a limitation. That's correct. And then he goes on to say that the LN subvectors are longer than the other two, are easier to obtain, so use of them is encouraged by practicality considerations as well as effectiveness tests. The effectiveness test, he's also saying it's difficult to do BC and CC because it took him two years to do this, but he's also referring to the effectiveness test. These are the words that encapsulate what his experimental results actually say about BC and CC when you take a harder look at them. And again, I just can't stress enough, it's about… It's confusing, though, because he has these sum-up statements at the end of various chapters that says BC and CC, they can be used too, and there's still some optimism about using them. Right. And don't ever try this BC-CC business. Well, Your Honor, I don't believe it's confusing because the reason why is yes, and BC and CC can be useful when you don't have direct links present. That's why he says that, because of the ISI where there's no direct links, it is useful. But when it comes to a situation where direct links are present, as required by our claim, it's not confusing. It's never useful. The only teachings that are addressed to that is don't use BC and CC, and the only experimental results are harmful. So yeah, there's some statements that generally BC and CC in some contexts might be useful, but not the context that the claims specifically require, where first numerical representation has been created. And Your Honor, if I may, I want to save some time for rebuttal. Yes, you have a little rebuttal time for that. Let's hear from Ms. Keefe. Okay. Actually, I would like to make one last point very quickly. And that is the petitioners—I want them to have a chance to respond to this. The petitioners seem to say if there's any substantial evidence that indirect relationships are useful, they're entitled to affirmance. But that is absolutely incorrect, because this is not a jury trial where one presumes all fact findings in favor of the petitioner that are necessary to support the prevailing party or the judgment. This is an IPR with a rule of kind, RUFET, which are cases cited on page 27 of my opening brief, as well as being affirmed recently by this court on Cuts First vs. Motive Power, a January 22, 2016 opinion that has come out, where the board must affirmatively explain the motivation to combine in its opinion or that you presume to the arrival of hindsight bias. And if I can, I can show you that there is no analysis directed to the issues that we're talking about here in the opinion, and they have failed to do so. Therefore, SRA is entitled to a reversal or at least a remand on this issue, regardless if there's substantial evidence in this record, because we have no idea what this board actually thought about that substantial evidence. And I want to turn to page 6, where the board does address indirect relationships. If we can turn to page 6 of the reply brief. I'm going to try to get this as fast as I can. And what is said here is the board only confines its analysis, if we turn to page 6, to whether the preamble's limitation of electronic database is taught away by the negative empirical results. What it fails to do is determine where the empirical evidence would teach away from the last three elements of the claim embodied in searching with indirect relationships. There's no attempt to explain why somebody would search using indirect relationships, even though empirically it hurts within the claimed arrangement. Rather, what the board solely focuses on is, we say that the Fox Papers, and the sum total of that language, if I get the court to look at it, is found on page 6 of our reply brief. It says, it's evidence that the graded results does not teach away from the combination of the Fox Papers, but rather from the modification and teachings of the Fox Papers to incorporate electronic database. Never does it explain why someone would be motivated to search and view the indirect relationships. They never refer to any of these quotes they now say as substantial evidence. We don't know what the board thinks about those quotes or whether they interpret them the way they're now alleging. It's just not part of the record. And under the rule of Kahn, what Kahn says in that situation is that you must, when the board does not explain the motivation or suggestion or teaching that would have led a skilled artist at the time of invention to the claim combination as a whole, we infer that the board used hindsight to conclude the invention was obvious. And you set aside the verdict. Here, they did not provide any explanation of why someone would search and view the massive amount of evidence we put on the indirect relationships and other information in the record. And that failure to explain affirmatively in their opinion requires that this court vacate the opinion. Of course, we would say that there's no point to even go back and remand because there's no substantial evidence as to this claimed arrangement. We could resolve this with a decision in favor of SRA here, right here and right now. But again, there's a complete failure to explain in the opinion. It only confines its analysis to direct links. And it does not provide a sufficient explanation of why someone would search in view of the negative empirical results. Thank you, Mr. Harvey. Ms. Keefe. To the extent that you've divided your time, it's up to you as to when you want to yield to your colleague. I appreciate it, Your Honor. Thank you. To briefly address, the board absolutely gave its rationale for why you would use the Fox Papers. As I explained when I first stood up, the board said that they found the Fox Papers to be useful. They cited directly to the pages in the Fox thesis that said that you would want to use BC and CC to enhance results, as I explained earlier. There's another quotation which has been ignored, which is on JA 05588 from the first record and 5718 for the 494 case, which specifically says, Fox says, co-citations, indirect, do much better, though still not as well as terms, when only direct co-citations are considered, they are better than authors, and here's the critical point, but still not as good as the combination of direct and indirect co-citations. So Fox is saying, it's still best when you use indirect as well as direct. And so, in fact, you would be motivated to use the claim to create indirect relationships because they will, in fact, enhance. The record is almost identical. The only thing that changes the 494 versus the 352 is that in the 494, it's actually an even broader claim that talks specifically about the fact that all you have to do is create these relationships and use them for searches. It doesn't link back up to the computer, and so it's even broader and therefore even more abstract. But all of the same motivations, all of the quotations that say using BC and CC improves can be found at 5693 in the original appendix, at 5583, which encourages further investigation, 5588, saying the combination of direct and indirect is incredibly positive, which we just saw, 5728, which says the indirect alone with terms yields a positive 5.6%. Which JAs are these sites coming from? I do apologize. Those were from the original. They are co-cited for 5728 is from the 494. So 5728 is the chart that you had been looking at earlier, which if you look through that entire chart, what it shows, this is the chart 8.11 at 5728 for the 494, co-cited at 5598 for the 352. Every time that BC and CC are added to terms, they improve the results. When BC is added, it's improved. When BC and CC are added, it's improved. But even more critically, the best result of all is when you add in all of the terms, including the indirect relationships. So absolutely, you would want to create indirect links, indirect couplings, in order to add them so that you have the best possible result. And therefore, the board does in fact have substantial evidence. The board indicated that it found these to be useful and therefore found that Fox said what it said and had all of the elements. And very last, I'd like to point out that the reason that the board focused so specifically on whether or not you would modify the references in order to include the electronic database and focused its attention on that in terms of the teaching away was because of a question posed directly to PatentOwner during the oral argument. The board asked PatentOwner, so you're saying, and this is directly in the board's decision, you're saying that the teaching away only goes to whether or not to modify the reference to include an electronic database. The answer was yes. The board therefore focused its attention on explaining that there was an adequate teaching to combine the references and use them with an electronic database. And that is replete through the board's analysis. But that doesn't negate the fact that earlier in the board's analysis, the board specifically said that it found what Fox was teaching to be useful, citing to a page that said adding BC and CC is useful and we want to keep doing that as affirmed by the results in Chapter 8. The end of Chapter 8 says using all of these subvectors, including indirect relationships, has a marked improvement and we want to keep looking at it. And with that, Your Honor, I'll pass my time over to my colleague. I don't think we're ready for you as yet. We haven't completed the response time. They've divided up the time. Thank you, Your Honor. Good morning, Your Honors. And I may have lost track of the time. I was going to address, with the court's permission, petitioner's cross appeal. I believe, if I followed the clock correctly, Mr. Hardy had used all of his 15 minutes for this proceeding, but maybe I was confused about that. Well, in any case, Jim. If the court is ready to hear argument on the cross appeal, that's what I'd like to speak to. Okay. Thank you, Your Honor. So petitioner's cross appeal concerns a single claim limitation. And that claim limitation, which is deriving actual cluster links from the set of candidate links, recites what the specification itself essentially describes as a routine step in the process of clustering, which is to say grouping similar documents together, which is, in turn, and long has been, a routine technique in information retrieval. And I think very significantly for this appeal, the parties are in agreement in their briefing that in finding that the Fox Papers failed to disclose that single step deriving actual cluster links from candidates, the board disregarded certain teachings within the Fox Papers. And we contend, and I would argue that SRA only half-heartedly disputes, that those particular teachings within the Fox Papers that the parties agree the board disregarded. About cluster splitting? Yes, specifically cluster splitting. I thought I saw the board actually talking about the notion of cluster splitting in its tree formation analysis. It didn't talk about it? The board mentioned splitting, and it mentioned specifically the uncore, what are called the uncore and concentration tests. And it said that these are a part of forming the tree, which is itself going a little bit astray. What the board did not do was consider at all the position that was presented by petitioners in our opening petition, opening declaration, and then consistently thereafter, that during the cluster splitting process, what occurs is, and I say cluster splitting, and that may be not the best abbreviation, because a little bit more accurately descriptive is cluster splitting and reformation of new clusters. So what happens is a cluster has a size limit. This is what Fox teaches. He gives the example of 20 documents. Otherwise, it becomes too unwieldy to be useful. When the cluster exceeds that size limit, the cluster is split, which is to say it's abolished. And what the system then does is it now has 21 documents that it wants to cluster. It wants to form new, smaller clusters out of those 21 documents. So what we presented below and what the board never engaged with is the following, that what happens in FoxSMART at that point and Fox Thesis is that the system creates what Fox describes as a complete similarity matrix, which consists of, again, using Fox's term, pairwise similarity values. So all that means is the system has 21 documents that it wants to cluster. The claim calls for selecting a node for analysis. Correct. And then all of the analysis is done with reference to that node. So the fact that a particular cluster on the tree during the formation process starts growing to a point where it needs to be cleaved into two, it's not really relevant to the question of the selected node. To what extent are the candidate cluster links being derived down to actual cluster links for that particular selected node? Well, they are, and I think the first thing to say about that is that was not the basis for the board's rejection. But what's the answer? But independently, the way that the process works is it picks a document of the 21. Say they're numbered and you have document one, and it calculates what is this document's similarity to every single other document in the grouping. So a node is a document. It's selecting a document, and it's performing a calculation to create a similarity value between what's the similarity between document one and document two? What's the similarity between document one and document three? But the node is being selected for creating a tree, the overall tree for the node. And then you start populating the tree, and you're creating clusters. And some clusters are, I don't know, on the visual tree closer to the node than other clusters. I think this is a little bit where the confusion arises. But the clustering, a node is selected for analysis in the claim to be clustered with other nodes based in permanent and direct relationships. That is what's taught in the FOX system. When documents are added to the tree in the first place, they are clustered. But what FOX teaches is that clusters need to have size limits to be useful. If you have 300 documents in a cluster, it's too big to be helpful. So a size limit is set. Say it's 20 documents. When a cluster exceeds that, it's abolished, and new clusters are formed. And each document is selected as a node, and analysis is performed with respect to each document as to how similar is this document to every other document in the group. And then the algorithm looks at what are the closest relationships, what FOX calls highly correlated pairs, the strongest similarity values. And it puts those into clusters. I see my time is up. Yes, you've saved some rebuttal time now that we're on the cross-appeal. So let's hear from Mr. Hardy. And let's limit the discussion to the new issues that have been raised on the cross-appeal. I would like to—I think you, Judge Chin, hit it right on the head. They never explain how this process generates candidates for a selected node or derives actuals for a selected node. You see, the clusters being split has nodes that are not linked to each other or have a common link. They have orphans in them. All through the FOX, they discuss it. Indeed, in the initial assignment of the tree, you just placed nodes in without respect to any particular relationship between the nodes. So what you have in what the complete similarity matrix or the 20 nodes that he's referring to, analyze it to every other node in the database, you will have orphans among that which are not linked to the selected node. Generating candidate cluster links for the selected node is referring to finding a set of candidates that are linked to one particular node. But I think what the opposing counsel is trying to say is if there's, say, a hard limit on the size of any given cluster, maybe it's 20 nodes. And then now you locate a new node in the database you want to insert in that cluster because that new node best fits with this particular family of nodes in one cluster. Now you've got to divide up that cluster. And now each of the now 21 nodes could be regarded as a selected node. And now you've got to understand and evaluate that individual selected node's relationship with all the other, quote unquote, selected nodes. And then by doing that, you pare down into two smaller clusters. And so everybody now is in a tighter, more closely linked family than the original 20 node cluster. But it just doesn't pan out that way. Actually, as I walk through this, you derive actual cluster links for the selected node. The derived actual cluster links have to come from the candidate set for a selected node. So the actual cluster links also have to link to the selected node. Now just because you pick one of those nodes and says that node is a conducted analysis, the problem is what they identified as the candidates is the 20 matrix, all 20 other nodes that are going to be analyzed in this matrix. And the problem with that is that can't be a candidate set for the selected node because it'll have five or six or some amount of those nodes are orphans and therefore have no link relationship to the selected node, therefore are not a candidate set for the selected node. And so, in other words, it includes an analysis of nodes without any respective position to the selected node. But this problem becomes far more acute when you move to the deriving step. Because what you're going to do in a deriving step, what you have to do is derive a set of actual cluster links for a selected node because they come from the candidates. Well, when you start picking out highly correlated pairs, you can pick out A and B as being highly correlated. And B and D is highly correlated. But B and D aren't related to each other, nor are they related to the same selected node. So at the end of this process, you also do not get actual cluster links for the selected node. And they've never attempted to explain this. And I submit that they still have not attempted to explain this anywhere in their papers. The more important point that I want to bring up, however, is that none of these processes are used to display nodes. In the end, these aren't actual cluster links being used to display nodes. The display procedures use document-to-similarity, query-to-similarity to display, and they're not based on cluster splitting. And I guess I will take that up. Since I have 30 seconds, it's a heady topic. And it's also in the 571. I'll take that up at that time. Okay. Thank you. Okay. Now let's see. Mr. Silbert, do you have some rebuttal time? Thank you very much, Your Honor. I do not see what the possibility of orphan nodes, which is to say documents in the original cluster that's being abolished that end up not being placed into one of the smaller clusters, therefore they're orphans, has to do with anything. So to repeat the process again, which is described in the Fox papers, and it's essentially exactly as Your Honor described it, Judge Chen, a document 21, number 21, is added to a cluster. System says, now the cluster's too big. It's exceeded the size limit. Therefore, the system abolishes the cluster. Now there are—and it knows it wants to create smaller clusters. There are now 21 documents that the system is analyzing that it wants to figure out how to put into clusters. It proceeds in an iterative process, document by document, which means selecting a node. It selects each document individually as a node, and it executes an algorithm to calculate the similarity value between the document it's examining and every one of those 20 other documents. It creates what Dr. Fox calls a complete similarity matrix. And so it's got a value for the similarity between every other document. What counsel is essentially saying is— Let me ask a different question. Let's assume for a second that this theory, we're not persuaded by it. And so it really comes down to this tree formation process that Fox teaches. And we also conclude that you create the tree, you populate the tree for the selected node, and there really isn't any final step where you, say, pare back that tree or you identify some portion of the tree as the actual cluster links. And so therefore, what we have here is not the 102. And so therefore, the board was right in denying the proposed 102 rejection. Why wasn't there a 103 case here? Because maybe it is obvious and routine to, once you have the tree, to say, well, instead of having a tree representing the entire database, basically ranking all the documents in the database, now I'm going to try to pare back in some way for relevance purposes just to some more tidier, less unwieldy sub-portion of that entire database. Why isn't there a 103 in here? I believe there unquestionably would be, and I think it's important in considering this issue to take a step back. I guess what I'm asking, you're the petitioner, so why didn't you bring the 103? So in retrospect, and I'd have to look at this particular issue, we may have, but the board instituted on particular grounds. And in this particular ground, it instituted on 102 clearly only preliminarily, but preliminarily finding that every claim was there explicitly taught. We do believe every claim limitation was. We do believe that that was correct. Certainly I think it goes without saying that if this limitation, which in all candor I don't think anyone thought would be much of a subject of dispute vis-a-vis the other things we've been talking about this morning, isn't there explicitly, then it is there. It's clearly an obvious thing to do. Just to take a step back, the idea of if you accept that using indirect relationships to calculate similarity, et cetera, was known, which it was and taught, what you get to in the cross appeal is the quote inventive idea is I'm going to have a set of candidates, and to pick the actual ones, I'm going to pick the strongest ones from among the candidates based on some criteria. Now, that notion in and of itself is such a basic way to go about selecting anything that it's hard to say that if everything else was known to say that I'm going to pick the actual cluster. But that's 103. That's 103. That's not 102. I mean, if Your Honor is asking why at the outset did we not petition alternatively on 103 grounds. That's my only question. I'm not – so first of all, I'm not positive that we didn't for this particular issue. We did petition on multiple grounds, and the board selected the ones that it was going to institute on. But certainly, I think that that – I don't think that should decide the outcome of this case. Thank you. Let's see. That concludes the argument. I think that concludes the argument on this issue. And let's – the appeal on 53.